**In the Matter of Langley ROSE and Ann Rose, Debtors.**

**NPC REALTY CO., Plaintiff,**

v.

**Langley ROSE and Ann Rose, Defendants.**

**Bankruptcy No. 80–01252–HB.
Adv. No. 80–0578–HB.**

United States Bankruptcy Court,
S. D. Texas,
Houston Division.

Jan. 7, 1981.

Wendy Thomas Kendall, Houston, Tex., for plaintiff.

Michael Pledger, Houston, Tex., for defendants.

## MEMORANDUM OPINION

JOHN R. BLINN, Bankruptcy Judge:

Langley and Ann Rose entered into a Sale Agreement with NPC Realty Co. on February 21, 1980 for purchase of a residence. The Agreement provided for the payment of a principal sum of $62,950 over 30 years with interest only for the first three years. If the Roses fully complied with the Agreement, NPC would deliver a warranty deed to the residence. The Agreement called for monthly payments of $718.00 for the first year commencing April 1, 1980. The debtors made timely payments for April, May and June but failed to make the July payment and on August 4 the debtors filed a petition under Chapter 13 of the Bankruptcy Code. They did not make the August, September or October pay-

ments and a post-petition payment which they intended to be for November was unilaterally applied by NPC to the September payment.

The debtors' first amended plan provided that the house was "for sale", a point on which the original plan was silent. The second amended plan specified the contract was to be assumed and the defaulted payments cured over time. The Trustee projects the 36 monthly payments of $350 contemplated by the plan will yield secured creditors 100% and unsecured creditors 28%.

NPC filed a complaint seeking various relief and although neither the complaint nor the response directly framed the issues, it is clear that two points are presented and on which the ultimate ruling of the Court will turn. Those points are first, whether the Agreement which is generally of a form known as a contract for deed gives rise to such an interest in property as to be property of the estate under § 541 of the Bankruptcy Code. Second, assuming that it is such property, does the plan comply with the stated requirements of § 365 of the Bankruptcy Code to allow the assumption of the contract.

As to the first point, NPC argues that because the Agreement provides the debtors will not receive legal or equitable title to the property until (and if) all payments under the Agreement have been made, such an interest is not the type of interest to fall within § 541, "property of the estate." Even assuming arguendo that the Agreement creates no legal or equitable *title* in the debtors until they have fully performed, § 541(a)(1) defines property of the estate as comprised of all legal or equitable *interests* of the debtor in property as of commencement of the case.

NPC urges that the outcome of the present case should be determined by the holding of *In re Spanish Language Television of Arizona*, 456 F.2d 159 (9th Cir. 1972) that conditional sales contracts do not vest in the debtor sufficient interests to justify assertion of bankruptcy court jurisdiction. But the contract in *Spanish Language Television* was made in 1967 and governed by

the Uniform Conditional Sales Act (U.S. C.A.) which was repealed in 1968 on adoption of the Uniform Commercial Code by the Arizona Legislature. In fact, Judge Ely noted in his opinion that the result would have been different had the agreement been governed by the U.C.C. U.C.C. Art. 9–202 states "[e]ach provision of Article 9 with regards to rights, obligations and remedies applies whether title to collateral is in the secured party or the debtor." This language was interpreted by Judge Kaufman in *Yale Express Systems, Inc.*, 370 F.2d 433 (2d Cir. 1966) as follows:

> Since the U.C.C. has abolished the technical distinction between the various security devices, the federal bankruptcy courts should no longer feel compelled to engage in the purely theoretical exercise of locating "title; " nor should the consideration of where "title lies" influence the courts in the exercise of their equitable discretion. Rather, the bankruptcy courts should assume their proper equitable function of scrutinizing the particular circumstances surrounding each petition for reclamation, in order to arrive at a just determination. Equitable considerations and the *substance* of the transaction should govern, regardless of the *form* of the security agreement. (Emphasis in original) 370 F.2d 433, 437–438.

Although the U.C.C. does not govern sales of realty (see U.C.C. Art. 9–104(j) and comments to U.C.C. Art. 9–102), *Yale Express* applies by analogy. Thus rather than abide by a rule of where "title lies", we should scrutinize the particular circumstances surrounding the Agreement in the present case to determine whether such property is includable within the bankruptcy estate.

■ The legislative history of § 541 indicates that the section is meant to be read broadly. S. Rep. No. 95–989, 95th Cong., 2d Sess. (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. *Collier on Bankruptcy* agrees "[t]he underlying theory of § 541 is to bring into the estate *all* interests of the debtor in property as of the date the case is commenced." ¶ 541.06–27. A recent case, *In re Belize Airways, Ltd.*, 5 B.R. 152 (Bkrtcy.S. D.Fla., 1980), held that leasehold interests constitute § 541 property. Although NPC attempts to distinguish leases from contracts for deed as "the difference between a covenant and a condition," NPC has not shown how the distinction should prevent the inclusion of the debtors' interest under the Agreement in the bankruptcy estate.

Having determined the interest of the debtors is property of the estate, we turn to the requirements of § 365. § 365(b) provides that if there has been a default in an executory contract of the debtor, the contract may not be assumed unless (a) any default is cured; (b) the parties are compensated for pecuniary loss resulting from the default; and (c) the debtor provides adequate assurance of his future performance under the contract. Of these three requirements, we will examine "adequate assurance of future performance".

■ The debtors' Chapter 13 budget filed August 4, 1980 specifies that the monthly income of the Rose family is $2132: husband—$1157, wife—$625, daughter living at home—$350. Monthly expenses (including the $718 house payment) are estimated at $1707, leaving a difference of $425. Proposed monthly plan payments are $350 (significantly, the exact amount of the daughter's contribution). After payments under the plan have been made, the debtors will be left with $75 at the end of each month for the balance of the first year of the Agreement. But in the second year of the Agreement payments increase from monthly installments of $718 ($565 interest plus $153 taxes and insurance) to $768, to $818 during the third year, and then to $850.37 during the fourth through thirtieth years; increases for which the debtors have made no provision. During the second year of the Agreement when payments increase $50, the debtor's monthly cushion will drop to $25 and then become a negative number in the third year.

At the time of trial the debtors were in arrears on four payments: $718/month × 4 months = $2872. The Agreement states that a purchaser shall pay a late penalty of 5% on any payment more than 15 days past

due. Assuming this clause remains effective, the $2872 figure should be increased by $143.60 to $2915.60. When only three payments were in arrears ($2154, not including late penalty), the debtors' second amended plan proposed to cure the default in 27 monthly payments of $80. The total arrears are now significantly higher and if the debtors wish to maintain the $80 payment level, it would take in excess of 36 months to cure the default. But even if the debtors are permitted to cure their default with $80 payments for a period of in excess of 36 months, it is apparent, given their initial $75 monthly cushion, that they will be unable to "afford" the required increased contract payments in the second, third and subsequent years without additional income or a plan modification reducing payments to unsecured creditors.

Performance by the debtors of the proposed plan, which makes no provision for the contract payment increases, is contingent upon the husband and wife remaining employed and receiving raises to offset inflation as well as the daughter living at home for the next three years and contributing to the family income. These are uncertain prospects. When the contract payment increases are taken into account, it is apparent that the debtors must find additional sources of income in order to perform the plan. These contingencies lead the Court to conclude that the debtors cannot provide adequate assurance of their future performance under the Agreement and it therefore may not be assumed.

Counsel for NPC is to present a proposed Judgment in conformity with this Memorandum Opinion within 10 days.